## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| STONEBRIDGE FINANCIAL CORP., ) | |
| ) | Case No. 15-14353(ELF) |
| Debtor. ) | |
| ) | |

**DEBTOR'S MOTION FOR AN ENTRY OF AN ORDER: (I) ESTABLISHING BIDDING AND SALES PROCEDURES; (II) APPROVING THE NOTICE AND SALE OF STONEBRIDGE BANK; AND (III) GRANTING RELATED RELIEF**

Stonebridge Financial Corp., (the "**Debtor**" or "**SFC**"), by and through its undersigned counsel, Drinker Biddle & Reath LLP, hereby moves this Court, pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") for an order: (I) approving the proposed auction and bid procedures (the "**Bidding Procedures**") as set forth in the within motion, and (II) scheduling an auction (the "**Auction**") and final sale hearing ("**Sale Hearing**") and approving the form and manner of the notice of the Auction and Sale Hearing; and (III) authorizing the sale of the stock of Stonebridge Bank free and clear of liens, claims, encumbrances, and interests ("**Claims**") subject to higher and/or better offers ("**Asset Sale**"); and granting related relief (the "**Motion**"). In support of this Motion, the Debtor respectfully represents to this United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Court**") as follows:

**PRELIMINARY STATEMENT**

1. The Debtor is a holding company, and its sole asset is the stock of Stonebridge Bank. Stonebridge Bank, like many community banks, has experienced a confluence of events that led to the commencement of this chapter 11 case (the "**Bankruptcy**"), which include regulatory constraints that prevent it from making deferred interest payments on its debt

obligations, coupled with an inability to restructure these debt obligations outside a bankruptcy. Furthermore, Stonebridge Bank has sustained seven years of losses totaling approximately $33 million. These losses, along with a stressed balance sheet, have placed pressure on capital and future earnings of Stonebridge Bank, the Debtor's sole asset.

2.      Prior to the filing of the Bankruptcy, the Debtor explored a variety of strategic alternatives. For example, the Debtor has, among other things, marketed Stonebridge Bank in order to maximize the value of its estate, and has negotiated with multiple potential investors and buyers.

3.      The Debtor engaged in discussions with numerous individuals and/or entities regarding investing in the Debtor and/or purchasing the Debtor's assets. However, pre-petition, these discussions did not produce any parties willing to enter into a confidentiality agreement in order to conduct due diligence for either a sale of the Debtor or a sale of Stonebridge Bank.

4.      After carefully considering all alternatives, the Debtor has concluded that a sale of Stonebridge Bank is the optimal means of preserving the value of its asset as a going concern and obtaining value in the Bankruptcy for the benefit of all stakeholders.

5.      A joint venture made up of current shareholders of SFC, some of which are on SFC's board of directors, have made an initial bid to purchase the stock of Stonebridge Bank, and have agreed to act as stalking horse bidders in an auction process within a chapter 11 bankruptcy filing (the "**Stalking Horse Bidders**"). Prior to the Bankruptcy, the Debtor tried to entice existing preferred stockholders to make a further investment in SFC, but the preferred shareholders resisted doing so. Only recently, when it became clear that SFC had exhausted its options and would default upon its obligations under certain bonds (commonly referred to as "trust preferred securities"), did the Stalking Horse Bidders make an offer which culminated in

the asset purchase agreement attached hereto as **Exhibit A** (the "**Agreement**").  The Stalking Horse Bidders required a break-up fee of $16,500 to cover the costs they have incurred in making the bid in the event they are ultimately not the successful bidder.  However, the Stalking Horse Bidders understand that even though the Debtor's business had been marketed prior to the Bankruptcy, their offer to purchase the stock of Stonebridge Bank is subject to higher and better offers and the approval of the Court and banking regulators.

6. Furthermore, the Debtor's CFO, who is not part of the Stalking Horse Bidders, has been engaged in active discussions with several other potential purchasers, interested parties and strategic buyers in an attempt to solicit additional bids for the sale of Stonebridge Bank.

7. Under the Agreement, the Stalking Horse Bidders have committed to buy Stonebridge Bank for cash consideration in the amount of $550,000.

8. If the transaction contemplated by the Agreement is consummated, Stonebridge Bank will be preserved for the benefit of its customers.  The proceeds of the sale shall be used to pay administrative expenses and to make a distribution to unsecured creditors.  Absent a sale of Stonebridge Bank, the SFC unsecured creditors will receive nothing.

9. The Debtor believes that the Agreement represents an opportunity to advance its reorganization goals of maximizing value to creditors while preserving the going concern value of Stonebridge Bank.

10. However, the Debtor also recognizes that now that a bankruptcy has been filed, there may be other interested bidders, and thus the Debtor is proposing a fulsome auction process whereby the Debtor will entertain any type of transaction that results in monetizing the Debtor's sole asset.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this chapter 11 case and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

12. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

13. The statutory predicate for the relief requested in this Motion are Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## BACKGROUND

### A. The Debtor's Bankruptcy Filing

14. On June 18, 2015 ("**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15. The Debtor continues to operate its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

16. No trustee or examiner has been appointed in the Debtor's chapter 11 case.

### B. The Debtor's Operations

17. SFC is a holding company that directly owns 100% of the stock of Stonebridge Bank.

18. The Debtor is a bank holding company and has no employees or business operations of its own.

19. Prior to the Petition Date, SFC entered into a financing transaction whereby it issued bonds commonly referred to as "trust preferred securities" or "TRUPS."  These securities allowed SFC to provide Stonebridge Bank with additional tier 1 capital.  The Debtor's unsecured

TRUPS obligation consists of principal and interest on the bonds totaling approximately $12 million.

## RELIEF REQUESTED

20. By this Motion, the Debtor seeks entry of an order, substantially in the form annexed hereto that (I) pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 the Bidding Procedures and proposed sale notice procedures are approved; (II) authorizes the sale of Stonebridge Bank, free and clear of Claims, subject to higher and/or better offers; and (III) grants related relief.

**A.    The Agreement and the Asset Sale**

21. The Debtor desires to effectuate the Asset Sale on the terms and conditions set forth in the Agreement, or on higher or otherwise better terms pursuant to a competitive auction process. During the process leading up to the Auction, the Debtor will consider bids for any type of sale transaction of the stock of SFC or Stonebridge Bank.

22. The Agreement provides for a sale of the stock of Stonebridge Bank, free and clear of all liens, claims and encumbrances, but subject to regulatory approval.

23. There is a $16,500 expense reimbursement/break-up fee for the Stalking Horse Bidders, to compensate them for the fees and costs incurred in making the Stalking Horse Bid, and the Stalking Horse Bidders required the expense reimbursement as a term in the Agreement.

## PROPOSED NOTICE, BID AND AUCTION PROCEDURES

**A.    Notice and Other Procedures**

24. The Debtor will be implementing the following notices and other sale procedures:

(a) <u>Sale Notice</u>: On or before August 21, 2015, the Debtor will serve notice of the Auction and Sale Hearing ("**Sale Notice**") by first class mail on: (i) all parties known to SFC and its professionals to have expressed an interest in Stonebridge Bank; (ii) the Office of the United States Trustee for the Eastern District of Pennsylvania ("**U.S. Trustee**"); (iii) the attorneys for Wilmington Trust, N.A. as indenture trustee; (iv) all equity holders of the Debtors; (v) the Debtor's Master Service List; and (vi) all other and all affected federal and local regulatory and taxing authorities, including the Internal Revenue Service (collectively, the "**Sale Notice Parties**"). The form of Sale Notice is annexed hereto as <u>Exhibit B</u>.

(b) <u>Date, Time, and Place of Auction</u>: An Auction will be conducted at the offices of Drinker Biddle & Reath LLP on Wednesday September 21, 2015 at 9:30 a.m. (prevailing Eastern Time). The Debtor will select the highest or best bid at the conclusion of the Auction, and the successful bidder ("**Successful Bidder**") will be required to enter into definitive agreements, which shall be subject to the approval of the Court at the Sale Hearing. The Auction may be adjourned without further notice by announcement at the Auction. Following the conclusion of the Auction, the Debtor will promptly file a notice with the Court identifying the Successful Bidder.

(c) <u>Objection Deadline to Sale Order(s)</u>: Objections to the relief sought in the Sale Order shall be in writing, filed, and served so as to be actually received by (i) the Debtor, Attn: Joseph Petrone, CFO; (ii) Drinker Biddle & Reath LLP, Counsel for the Debtors, Attn: Andy Kassner and Kristin Going; (iii) the Office of the United States Trustee, Attn: Dave Adams; (iv) Wilmington Trust N.A., Attn: Larry Kotler, by September 25, 2015 at 4:00 p.m. (prevailing Eastern time). As soon as practicable after the conclusion of the Auction, the Debtor will file a final form of the Sale Order as agreed upon between the Debtor and the Successful Bidder.

(e) <u>Information Provided to Interested Parties</u>: The Debtor either has provided or will provide to all parties that have either expressed an interest in purchasing the Assets or who the Debtor believes may have an interest in purchasing their assets, and have entered into a confidentiality and non-disclosure agreement with the

Debtor (each an "**Interested Party**" and, collectively, the "**Interested Parties**"), certain information in connection with the proposed sale, including, among other things, these Bidding Procedures. The Debtor will continue its discussions with certain investment bankers in order to generate bids, if feasible, and will publish notice of the Auction in a national newspaper.

(f)     Good Faith Deposit:  Unless otherwise expressly waived by the Debtors, bidders will be required to submit good faith deposits ("**Good Faith Deposits**") with the Debtors on or before September 18, 2015 at 4:00 p.m. (prevailing Eastern time) ("**Bid Deadline**"). Such Good Faith Deposits shall be equal to ten percent (10%) percent of the aggregate purchase price of such bid. Good Faith Deposits of all bidders shall be held in a separate account until the Successful Bidder consummates its transaction. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtor.

**B.     The Bidding Procedures**

25.    As set forth above, the Debtor proposes to hold the Auction on September 21, 2015. Any bidder may submit an overbid to the offer made by the Stalking Horse Bidders (the "**Stalking Horse Bid**") prior to the Bid Deadline. The initial overbid must be at least $20,000 in excess of the Stalking Horse Bid, and subsequent overbids must be in increments of at least $50,000. For any party other than the Stalking Horse Bidders to become a qualified bidder, (each a "**Qualified Bidder**"), that party must do the following:

- On or before September 18, 2015 at 4:00 P.M. (prevailing eastern time), provide the Debtor with a draft asset purchase agreement together with a blackline version marked to show changes from the Agreement;

- The bid shall fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

- The bid shall state that the bidding party consents to the jurisdiction of the Bankruptcy Court for the purpose of resolving any issues related to the Auction;

- The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the purchase agreement of the bidder;

- The bid shall be accompanied by and provide the Debtor with evidence of financial ability to consummate the purchase after the Court enters an order approving the sale;

- The bid shall be accompanied by the filings necessary to obtain regulatory approval of the sale of Stonebridge Bank;

- At the time of submission of the bid, the bidder shall provide the Debtor or an acceptable escrow company with a Good Faith Deposit of 10% of the bid, refundable after closing with the successful bidder if the bidder is outbid at the Auction; and

- Agree to appear and participate in the Auction.

26.   In the event that the Stalking Horse Bidders are not the Successful Bidder at the Auction, the Debtor seeks authority to pay the Stalking Horse Bidders a total of $16,500 as a combined break-up fee/expense reimbursement. This amount will be entitled to a superpriority administrative expense and will be payable from the proceeds of the sale to the successful overbidder. The Debtor reserves the right to modify such Bidding Procedures as necessary or as

it deems appropriate, to maximize value for the Debtor's estate. A bidder must submit a marked form of the Agreement attached hereto as Exhibit A. The Debtor, in its business judgment, and after review of all bids submitted and a meeting of a special committee of its directors who are not part of the Stalking Horse Bidders, will determine which offer maximizes the value of the Debtor's assets and is consistent with the Debtor's reorganization goals. The Debtor believes that the Bidding Procedures are appropriate and will maximize the recovery for the Debtor and its estate in the most efficient manner possible.

27. The Debtor further believes that these Bidding Procedures provide an appropriate framework for selling its sole asset and will enable the Debtor to review, analyze, and compare all bids received to determine which bid(s) are in the best interests of the Debtor and its estate.

C. **The Auction**

28. The Debtor will commence the Auction on **September 21, 2015 at 9:30 a.m. (prevailing Eastern Time)**. Any bidder who submits a Qualified Bid (as defined herein) may participate in the Auction.

29. Bidding will continue with respect to the Auction until the Debtor determines that it has received the highest or otherwise best bid. After the Debtor so determines, it will close the Auction, subject, however, to its right to re-open the Auction if necessary. The Debtor will then determine and announce which sale has been determined to be the highest or otherwise best bid (the "**Successful Bid**").

30. In determining which bid is a Successful Bid, the Debtor will consider each bid, provided, however, that economic considerations shall not the be the sole criteria upon which the Debtor may base its decision and the Debtor shall take into account all factors it believes to be relevant in the exercise of its business judgment.

## APPLICABLE AUTHORITY

**A.  Disposition of the Debtor's Asset Under
Section 363 of the Bankruptcy Code is Warranted**

31.  Ample authority exists for the approval of the proposed disposition of the asset through a sale to the Stalking Horse Bidders or another purchaser. Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .

*See* 11 U.S.C. § 363(b)(1); *see* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

32.  The decision to dispose of assets outside the ordinary course of business is based upon the sound business judgment of the debtor. *Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also*, *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'").

33.  In order to receive approval of the sale of an asset under section 363 of the Bankruptcy Code, a debtor must establish (i) that a sound business purpose justifies the sale of the assets outside the ordinary course of the debtors business; (ii) that accurate and reasonable notice has been provided to interested persons; (iii) that the debtor in possession has obtained a fair and reasonable price; and (iv) good faith. *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

34. Ample business justification exists in this case to approve the Bidding Procedures. The Debtor has considered all alternatives and determined that the immediate sale of the bank is in the best interests of its estate and creditors. Stonebridge Bank is the sole asset of the Debtor, and given the regulatory restrictions on distributions from Stonebridge Bank to SFC, absent a sale of the bank, creditors of SFC will not receive any money on account of their claims. Furthermore, the Debtor is unable to restructure its unsecured debt outside of a bankruptcy.

35. The notice procedures proposed ensure that all interested parties will receive in excess of thirty days' notice of the auction, while the Debtor's Bidding Procedures are structured to provide any party interested in engaging in any form of sale transaction an opportunity to bid.

**B.    The Successful Bidder Should be Afforded
All Protections Under Section 363(m) as a Good Faith Purchaser**

36. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d at 147.

37. The selection of any purchaser for the disposition of the Debtor's sole asset will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process. The Debtor intends to request at the Sale Hearing a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**C.     The Bidding Procedures are Reasonable and Appropriate**

38.     The Debtor believes that the Bidding Procedures ensure that the bidding process with respect to the Auction will be fair and reasonable and will produce the maximum value for its estate and creditors.

**D.     The Court Should Approve the Proposed Form of Notice.**

39.     The Court should approve the proposed form of notice attached hereto as Exhibit B because it provides parties with the information necessary to determine whether to overbid (or, alternately, to object to the sale) and because it complies with the applicable rules.  The notice includes the time and place of the public sale and the time fixed for filing objections, as required by Bankruptcy Rule 2002(c)(1), and will be served on all creditors, as required by Bankruptcy Rule 2002(a)(2).  Further, the notice provides all the information required by Bankruptcy Rule 6004.

**NOTICE**

40.     The Debtor has caused notice of this Motion to be given to the following persons or entities:  (i) all parties known to SFC and its professionals to have expressed an interest in Stonebridge Bank; (ii) the Debtor's Master Service List; (iii) Wilmington Trust, N.A.; (iv) the Office of the U.S. Trustee; (iv) the relevant regulatory authorities; and (vi) all other parties requesting notice in this Bankruptcy.

41.     The Debtor submits that no further notice is required.

**NO PRIOR REQUEST**

42.     No prior request for the specific relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests the entry of an order, substantially in the form attached hereto: (i) fixing September 18, 2015 at 4:00 p.m. (Prevailing Eastern Time) as the bid deadline; (ii) establishing August 6, 2015 at 4:00 p.m. as the objection deadline; (iii) authorizing the Debtor to conduct an auction of Stonebridge Bank on September 21, 2015 at 9:30 a.m. (Prevailing Eastern Time), and setting a sale hearing shortly thereafter; and (vi) granting such other and further relief as the Court deems just and proper.

Dated: July 20, 2015                              **DRINKER BIDDLE & REATH LLP**

*/s/ Joseph N. Argentina, Jr.*
Andrew C. Kassner
Joseph N. Argentina, Jr.
One Logan Square
Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Facsimile:  (215) 988-2757

*Proposed Attorneys for Stonebridge Financial Corp.*