# EXHIBIT A

## EXECUTED ASSET PURCHASE AGREEMENT

EXECUTION VERSION

(SUBJECT TO COURT APPROVAL)

STOCK PURCHASE AGREEMENT

BY AND AMONG

STONEBRIDGE FINANCIAL CORP.

AND

THE PERSONS LISTED ON SCHEDULE 1 HERETO

dated as of

June 18, 2015

ARTICLE I        CERTAIN DEFINITIONS ................................................. 1
    1.1    Certain Definitions ......................................................... 1

ARTICLE II       CLOSING; DELIVERIES AT THE CLOSING ........................... 6
    2.1    Closing ........................................................................ 6
    2.2    Competing Transactions; Bankruptcy Court Approval ............. 6
    2.3    No Collusive Bidding ..................................................... 7
    2.4    Payment of Purchase Price ............................................. 7
    2.5    Deliveries by Stonebridge at the Closing ........................... 7
    2.6    Deliveries by the Purchasers at the Closing ........................ 8

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF STONEBRIDGE ........... 8
    3.1    Organization ................................................................ 8
    3.2    Capitalization .............................................................. 8
    3.3    Consents ..................................................................... 9
    3.4    Power and Authority ...................................................... 9
    3.5    Non-contravention ........................................................ 9
    3.6    Title .......................................................................... 10
    3.7    No Other Representations or Warranties ............................ 10

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF PURCHASERS ........... 10
    4.1    Authority; No Violation ................................................ 10
    4.2    Consents ................................................................... 11
    4.3    No Other Representations or Warranties ........................... 11

ARTICLE V        COVENANTS OF THE PARTIES ....................................... 11
    5.1    Access to Information ................................................... 11
    5.2    Conduct of Business ..................................................... 11
    5.3    Maintenance of Insurance .............................................. 11
    5.4    Notification of Certain Matters ....................................... 12
    5.5    Cooperation ............................................................... 12
    5.6    Confidentiality ............................................................ 12
    5.7    Certain Agreements ...................................................... 12
    5.8    Regulatory Matters ...................................................... 13

ARTICLE VI       CLOSING CONDITIONS ................................................ 13
    6.1    Conditions to Each Party's Obligations under this Agreement ... 13
    6.2    Additional Conditions to Obligations of the Purchasers ........... 13
    6.3    Additional Conditions to Obligations of Stonebridge ............ 14

ARTICLE VII      TERMINATION, AMENDMENT AND WAIVER ....................... 15
    7.1    Termination ................................................................ 15
    7.2    Effect of Termination ................................................... 16
    7.3    Amendment, Extension and Waiver ................................. 17

ARTICLE VIII     MISCELLANEOUS ...................................................... 17
    8.1    Public Announcements .................................................. 17

8.2    Survival ................................................................................................ 17
8.3    Expenses ............................................................................................... 17
8.4    Notices .................................................................................................. 17
8.5    Parties in Interest ................................................................................ 19
8.6    Complete Agreement ........................................................................... 19
8.7    Counterparts ......................................................................................... 19
8.8    Severability .......................................................................................... 19
8.9    Governing Law ..................................................................................... 19
8.10   Purchaser Liability .............................................................................. 20
8.11   Interpretation ....................................................................................... 20

Schedule 1: Schedule of Purchasers
Exhibit A: Sale Procedures Order

This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of June 18, 2015, is made by Stonebridge Financial Corp., a Pennsylvania corporation ("Stonebridge"), and each of the Persons listed on Schedule I hereto (each, a "Purchaser" and, collectively, the "Purchasers"). Certain capitalized terms have the meanings given to them in Article I.

RECITALS

WHEREAS, the Board of Directors of Stonebridge, including the directors not affiliated with the Purchasers, has (i) determined that this Agreement and the business combination and related transactions contemplated hereby are in the best interests of their respective companies, shareholders and other constituencies and (ii) has approved this Agreement; and

WHEREAS, in accordance with the terms of this Agreement, the Purchasers will acquire (the "Acquisition") 100% of the outstanding Bank Stock (as defined below) of Stonebridge Bank, a Pennsylvania chartered bank and wholly-owned subsidiary of Stonebridge (the "Bank"); and

WHEREAS, Stonebridge desires to sell to Purchasers and Purchasers desire to purchase from Stonebridge, 100% of the outstanding Bank Stock free and clear of all Liens, Claims, Liability, Interests, Rights and Encumbrances (as defined below);

WHEREAS, on the date hereof, Stonebridge filed a voluntary petition for relief (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Bankruptcy Code ("the Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"); and

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the business transactions described in this Agreement and to prescribe certain conditions thereto.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

ARTICLE I
CERTAIN DEFINITIONS

1.1     Certain Definitions. As used in this Agreement, the following terms have the following meanings (unless the context otherwise requires, references to Articles and Sections refer to Articles and Sections of this Agreement). Accounting terms used in this Agreement without definition shall have the meanings given to such terms in accordance with GAAP.

"Affiliate" means any Person who, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person and,

without limiting the generality of the foregoing, includes any executive officer or director of such Person and any Affiliate of such executive officer or director.

"Agreement" means this agreement, together with the Exhibits, the Disclosure Schedules and any amendments hereto.

"Bank Stock" shall have the meaning set forth in Section 3.2.

"Bank Regulator" shall mean any federal or state banking regulator, including but not limited to the FRB, the FDIC and the PDB, that regulates the Bank or Stonebridge, as the case may be.

"Bank Regulatory Reports" means the Call Reports of the Bank and accompanying schedules, as filed with the FDIC, for each calendar quarter beginning with the quarter ended December 31, 2014, through the Closing Date, and all reports filed with the PDB or FRB by Stonebridge or the Bank from December 31, 2013 through the Closing Date.

"BHCA" shall mean the Bank Holding Company Act of 1956, as amended.

"Bid Procedures" shall mean the bid procedures governing the process by which the Acquisition shall occur, which are attached to the Sale Procedures Order as Exhibit A.

"Breaching Party" shall have the meaning set forth in Section 7.1(b).

"Certificates" shall mean certificates evidencing shares of Bank Stock.

"Closing" shall have the meaning set forth in Section 2.1.

"Closing Date" shall have the meaning set forth in Section 2.1.

"Deposit" shall have the meaning set forth in Section 2.4(a).

"Disclosure Schedules" shall mean any written disclosure schedule delivered by a party hereto specifically referring to the appropriate section of this Agreement.

"Escrow Account" shall have the meaning set forth in Section 2.4(a).

"Escrow Agent" shall have the meaning set forth in Section 2.4(a).

"Failing Party" shall have the meaning set forth in Section 7.1(c).

"FDIC" shall mean the Federal Deposit Insurance Corporation or any successor thereto.

"Final Order" shall mean an Order (including any modification or amendment thereof) that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such an appeal or review has been taken, (i) it has been resolved and no longer remains pending, or (ii) an appeal or review has been taken timely but such Order has not been stayed and Stonebridge and

2

the Purchasers have mutually agreed in writing that the Order from which such appeal or review is taken should be deemed to be a Final Order within the meaning of this Agreement.

"FRB" shall mean the Board of Governors of the Federal Reserve System and, where appropriate, the Federal Reserve Bank of Philadelphia.

"GAAP" shall mean the current accounting principles generally accepted in the United States of America, consistently applied with prior practice.

"Governmental Entity" shall mean any federal or state court, administrative agency or commission or other governmental authority or instrumentality.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge" as used with respect to a Person means the actual knowledge, of, with respect to Stonebridge, the executive officers of such Person, and not including any facts, matters or circumstances otherwise actually known by any of the Purchasers, and including any facts, matters or circumstances set forth in any written notice or other correspondence from any Bank Regulator or any other written notice or correspondence from any other Governmental Entity received by that Person. Use in this Agreement of "know," "knows," or "known" shall in each case mean having "Knowledge."

"Law" or "Laws" means all federal, state and local laws, ordinances, rules, regulations, standards and Orders.

"Liens" means any lien, claim, charge, option, encumbrance, mortgage, pledge or security interest or other restriction of any kind.

"Liens, Claims, Liabilities, Interests, Rights and Encumbrances" means collectively any and all claims, Liens, liabilities, interests, Rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any Governmental Entity, decrees of any court or foreign or domestic Governmental Entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees under section 365(n) of the Bankruptcy Code or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or

undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, Law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories.

"Material Adverse Effect" shall mean, with respect to the Bank, respectively, any event, circumstance, change, occurrence or effect that (i) is material and adverse to the assets, financial condition, results of operations or business of Stonebridge and the Bank taken as a whole, or (ii) does or would materially impair the ability of either Stonebridge and/or the Bank, on the one hand, or the Purchasers, on the other hand, to perform its obligations under this Agreement or otherwise materially threaten or materially impede the consummation of the transactions contemplated by this Agreement; *provided* that "Material Adverse Effect" shall not be deemed to include the impact of the following on the assets, business, financial condition or results of operations of the parties and their respective subsidiaries:  (a) changes in Laws and regulations affecting banks or their holding companies generally, or interpretations thereof by courts or Governmental Entities that do not have a materially disproportionate impact on such party; (b) changes in GAAP or regulatory accounting principles generally applicable to financial institutions and their holding companies that do not have a materially disproportionate impact on such party; (c) actions and omissions of a party hereto taken with the prior written consent of the other party in furtherance of the transactions contemplated hereby; (d) the announcement of this Agreement and the transactions contemplated hereby, and compliance with this Agreement, including reasonable expenses incurred by the parties hereto in consummating the transactions contemplated by this Agreement; (e) changes in national political or social conditions including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon or within the United States, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States that do not have a materially disproportionate impact on such party; (f) economic, financial market or geographical conditions in general, including changes in economic and financial markets and regulatory or political conditions whether resulting from acts of terrorism, war or otherwise, that do not have a materially disproportionate adverse effect on such party; (g) any failure, in and of itself, by such party to meet any internal projections, forecasts or revenue or earnings predictions (it being understood that the facts giving rise or contributing to any such failure may be deemed to constitute, or be taken into account in determining whether there has been or would reasonably be expected to be, a Material Adverse Effect or unless such facts are otherwise an exception set forth herein); (h) changes in the banking industry that do not have a materially disproportionate impact on such party; or (i) any action taken in compliance with or in furtherance of any agreement or Order with or at the direction of a Bank Regulator or in accordance or compliance with a Regulatory Agreement and the direct or indirect costs, consequences, or effects thereof.

"Order" shall mean any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made or rendered by any court, administrative agency or other Governmental Entity.

"Other Real Estate Owned" shall mean any real estate acquired through foreclosure or by a deed in lieu of foreclosure, or any real estate classified as Other Real Estate Owned or Real Estate Owned.

"PBC" shall mean the Pennsylvania Banking Code of 1965, as amended.

"PDB" shall mean the Pennsylvania Department of Banking and Securities.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, company, trust, "group" (as that term is defined under the Exchange Act), or any other legal entity.

"Purchase Price" shall have the meaning in Section 2.4 hereto.

"Regulatory Agreement" means any written notification or any other communication from any Bank Regulator (i) asserting that Stonebridge, the Bank or any Subsidiary is not in material compliance with any of the statutes, regulations or ordinances which such Bank Regulator enforces; (ii) threatening to revoke any license, franchise, permit or governmental authorization that is material to Stonebridge, the Bank or any Subsidiary; (iii) indicating that Stonebridge, the Bank or any Subsidiary is not acting in accordance with any agreement or Order with any Governmental Entity or Bank Regulator that is charged with the supervision or regulation of banks or engages in the insurance of bank deposits; or (iv) directing, restricting or limiting, or purporting to direct, restrict or limit, in any manner the operations of Stonebridge, the Bank or any Subsidiary, beyond those restrictions currently in effect.

"Regulatory Approvals" means the approval of any Bank Regulator or any plan or Order of the Bankruptcy Court approving this Agreement and the Acquisition, which, in each case, is necessary in connection with the consummation of the Acquisition and the related transactions contemplated by this Agreement.

"Regulatory Filings" shall have the meaning set forth in Section 5.8.

"Representatives" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"Required Notification" shall have the meaning set forth in Section 5.4.

"Rights" shall mean warrants, options, rights, convertible securities, stock appreciation rights and other arrangements or commitments which obligate a Person to issue or dispose of any of its capital stock or other ownership interests or which provide for compensation based on the equity appreciation of its capital stock.

"Sale Procedures Motion" shall mean that certain motion filed concurrently herewith by Stonebridge in the Bankruptcy Case pursuant to which, among other things, Stonebridge requested an Order (a) approving the Bid Procedures, (b) establishing a date for an auction, and (c) scheduling a sale hearing.

"Sale Procedures Order" shall mean the Order of the Bankruptcy Court to be entered approving the Sale Procedures Motion.

"Stonebridge Financial Statements" shall mean (i) the audited consolidated financial statements of Stonebridge as of December 31, 2014, and for the two years ended December 31, 2014 and December 31, 2013, including the notes thereto, and (ii) the unaudited interim consolidated financial statements of Stonebridge as of the end of each calendar quarter following December 31, 2014 and for the periods then ended, including the notes thereto.

"Subsidiary" means any corporation, partnership, limited liability company or other entity of which more than 20% of the outstanding capital stock or partnership, membership or other equity interests is owned, either directly or indirectly, by Stonebridge or the Bank, except any corporation, partnership, limited liability company, or other entity the stock, partnership, membership, or other equity interests of which is held in the ordinary course of the lending activities of the Bank.

"Tax" or "Taxes" shall mean all federal, state, local and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, value-added, stamp, documentation, payroll, employment, severance, withholding, duties, license, intangibles, franchise, backup withholding, environmental, occupation, alternative or add-on minimum taxes imposed by any Governmental Entity, and other taxes, charges, levies or like assessments, and including all penalties and additions to tax and interest thereon.

"Termination Date" shall mean September 30, 2015, unless extended by mutual agreement of the parties hereto.

"Termination Fee" shall be $16,500.

"Voting Debt" shall have the meaning set forth in Section 3.2(a).

Other terms used herein are defined in the Preamble, Recitals and elsewhere in this Agreement.

## ARTICLE II
## CLOSING; DELIVERIES AT THE CLOSING

2.1    Closing.  The closing ("Closing") shall take place at the offices of Drinker Biddle & Reath LLP, One Logan Square, Suite 2000, Philadelphia, PA 19103, or such other place or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the parties hereto, no later than the later of the close of business on (i) the second business day following the satisfaction or (to the extent permitted by applicable Law) waiver of the conditions set forth in Article VI (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or (to the extent permitted by applicable Law) waiver of those conditions), and (ii) the satisfaction of all terms and conditions to the Closing required pursuant to, or in accordance with, any Regulatory Approvals (the "Closing Date").

2.2    Competing Transactions; Bankruptcy Court Approval.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Stonebridge of higher or better competing bids pursuant to the Sale Procedures Order and the Bid Procedures approved thereby (each, a "Competing Bid").  Until Stonebridge designates a Successful Bidder (as defined in the Bid Procedures), Stonebridge is permitted to cause its Representatives and Affiliates to initiate

contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or disposition of the Bank Stock. Thereafter, Stonebridge is permitted to respond to, but not solicit, any inquiries or offers to purchase all, but not less than all, of the sale, and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Procedures Order or other applicable Law, including, supplying information relating to the Bank's business to prospective purchasers. In soliciting Competing Bids and in conducting any auction resulting from the receipt of a Competing Bid for the Bank Stock, Stonebridge shall comply with the Sale Procedures Motion and Bid Procedures.

2.3    No Collusive Bidding. The Purchasers hereby confirm that they have not engaged in any collusive bidding or violated any applicable Law with respect to the auction of the Bank or that would constitute a basis for avoiding the Acquisition or the recovery of damages under section 363(n) of the Bankruptcy Code.

2.4    Payment of Purchase Price. The purchase price for the Bank Stock shall be Five Hundred Fifty Thousand and 0/100 Dollars ($550,000.00) (the "Purchase Price"). The Purchase Price shall be payable by Purchasers to Stonebridge as follows:

(a)    As security for the Purchasers' faithful performance of their obligations hereunder, concurrent with, or promptly following, the execution of this Agreement, the Purchasers shall jointly deposit Fifty Five Thousand and 00/100 Dollars ($55,000.00) (the "Deposit") into a segregated, non-interest-bearing, trust account (the "Escrow Account") held by Drinker Biddle & Reath LLP, One Logan Square, Suite 2000, Philadelphia, PA 19103 (the "Escrow Agent"), such Deposit to be held in the Escrow Account until such time as the Deposit is distributed in accordance with the terms of this Agreement. In the event that the Acquisition is consummated in accordance with this Agreement, the Deposit shall be released to Stonebridge in accordance with the terms of this Agreement at the Closing, and the Deposit shall be applied against the Purchase Price.

(b)    At the Closing, the Purchasers shall pay to Stonebridge the balance of the cash portion of the Purchase Price in excess of the Deposit, by wire transfer of immediately available funds to an account or accounts designated in writing by Stonebridge prior to the Closing.

2.5    Deliveries by Stonebridge at the Closing. At the Closing, Stonebridge shall furnish and deliver to the Purchasers the following:

(a)    the Certificates, duly endorsed for transfer by Stonebridge or accompanied by duly executed transfer powers of Stonebridge;

(b)    a certificate, dated as of the Closing Date and signed by Stonebridge, certifying that each of the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied; and

(c)    all other certificates, instruments and documents required to be delivered by Stonebridge pursuant to this Agreement and such other documents customarily delivered and viewed as necessary or advisable by the Purchasers.

2.6    <u>Deliveries by the Purchasers at the Closing</u>.  At the Closing, the Purchasers shall furnish and deliver to Stonebridge the following:

(a)    the portion of the Purchase Price in excess of the Deposit, by wire transfer of immediately available funds to an account or accounts designated in writing by Stonebridge;

(b)    an authorization, in form and substance satisfactory to Stonebridge, to the Escrow Agent to release the Deposit to Stonebridge;

(c)    a certificate, dated as of the Closing Date and signed the Purchasers, certifying that each of the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied; and

(d)    all other certificates, instruments and documents required to be delivered by the Purchasers pursuant to this Agreement and such other documents customarily delivered and viewed as necessary or advisable by Stonebridge.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF STONEBRIDGE

Stonebridge hereby represents and warrants to the Purchasers that the statements contained in this Article III are correct and complete as of the date of this Agreement, except as set forth in the Disclosure Schedules delivered by Stonebridge on the date hereof.  For purposes of the Disclosure Schedules, any item disclosed on any schedule therein is deemed to be fully disclosed with respect to all schedules under which such item may be relevant.

3.1    <u>Organization</u>.

(a)    The Bank is a Pennsylvania-chartered bank duly organized and validly existing under the Laws of the Commonwealth of Pennsylvania and is regulated by the PDB and the FDIC.  The Bank has the requisite corporate power and authority to carry on its business as now conducted and is duly licensed or qualified to do business in the Commonwealth of Pennsylvania and foreign jurisdictions where its ownership or leasing of property or the conduct of its business requires such license or qualification.  The deposits of the Bank are insured by the FDIC to the fullest extent permitted by Law, and all premiums and assessments required to be paid in connection therewith have been paid by the Bank when due.

(b)    The Bank has no Subsidiaries other than those formed to hold Other Real Estate Owned.

3.2    <u>Capitalization</u>.

(a)    The authorized capital stock of the Bank consists of 600,000 shares of common stock, $1.00 par value per share (the "Bank Stock").  As of the date of this Agreement,

(a) there are 600,000 shares of Bank Stock issued and outstanding, (b) no shares of Bank Stock are held by the Bank as treasury stock, (c) all of such Bank Stock is owned by Stonebridge, and (d) no other shares of capital stock or Rights or other voting securities of the Bank are issued, reserved for issuance or outstanding. All of the issued and outstanding shares of the Bank Stock are Common Stock and have been duly authorized and validly issued, are fully paid, nonassessable and free of preemptive rights. As of the date of this Agreement, there are no bonds, debentures, notes or other indebtedness having the right to vote on any matters on which shareholders may vote ("Voting Debt") of the Bank, nor are any securities, bonds, debentures, notes or other indebtedness or ownership rights in the Bank issued or outstanding.

(b)    Stonebridge owns all of the outstanding Bank Stock free and clear of all Liens, Claims, Liabilities, Interests, Rights and Encumbrances, subject to any required Regulatory Approvals.

(c)    There are no contractual or other rights or obligations (including preemptive rights) of Stonebridge or the Bank to purchase or sell any shares of capital stock, partnership, membership or joint venture interests, or other equitable interests in the Bank.

3.3    <u>Consents</u>.  Except for the Regulatory Approvals and compliance with any conditions contained therein, no consents or approvals or waivers of, or filings or registrations with, any Governmental Entity are, or will be, necessary, and no consents or approvals of any third parties are, or will be, necessary, in connection with (a) the execution and delivery of this Agreement by Stonebridge and (b) the completion by Stonebridge of the transactions contemplated hereby.

3.4    <u>Power and Authority</u>.  Upon receipt of the Regulatory Approvals, Stonebridge shall have all requisite power and authority to enter into this Agreement to consummate the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Stonebridge. Upon receipt of the Regulatory Approvals, this Agreement shall constitute a valid and binding obligation of Stonebridge, enforceable against Stonebridge in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and principles of equity affecting creditors' rights and remedies generally.

3.5    <u>Non-contravention</u>.  Subject to the receipt of the Regulatory Approvals, the execution and delivery of this Agreement by Stonebridge and the performance by Stonebridge of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of either of Stonebridge or the Bank, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Contract, (iii) violate any Law or Order applicable to the Bank, or (iv) result in the imposition of any Liens, Claims, Liabilities, Interests, Rights and Encumbrances on the Bank Stock; other than, in the case of (ii) or (iii) above, any violation, conflict, breach, default, acceleration, termination, modification, cancellation or notice that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

3.6    Title. Stonebridge has good and marketable title to the Bank Stock, which title shall be transferred to the Purchasers free and clear of all Liens, Claims, Liabilities, Interests, Rights and Encumbrances, subject to any Regulatory Approvals. Upon the completion of the transactions contemplated hereby, the Purchasers will be vested with good and marketable title to the Bank Stock, free and clear of all Liens, Claims, Liabilities, Interests, Rights and Encumbrances, other than any Liens, Claims, Liabilities, Interests, Rights and Encumbrances imposed upon the Bank Stock by the Purchasers or any of their respective creditors or other financing sources, or pursuant to any Regulatory Approvals.

3.7    No Other Representations or Warranties. Except for the representations and warranties made by Stonebridge in this Article III, neither Stonebridge nor any other Person makes any express or implied representation or warranty with respect to Stonebridge or the Bank, or their respective subsidiaries or businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects or with respect to any oral or written information presented to the Purchasers or any of the Purchasers' respective Affiliates or Representatives in the course of their due diligence investigation of Stonebridge and the Bank, the negotiation of this Agreement or otherwise in the course of the transactions contemplated hereby, and Stonebridge hereby disclaims any such other representations or warranties.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers, severally, but not jointly, hereby represent and warrant to Stonebridge that the statements contained in this Article IV are correct and complete as of the date of this Agreement.

4.1    Authority; No Violation.

(a)    Each Purchaser has full power and authority to execute and deliver this Agreement and, subject to receipt of the Regulatory Approvals, to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by each Purchaser and, subject to the receipt of the Regulatory Approvals and due and valid execution and delivery of this Agreement by Stonebridge, constitutes the valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity.

(b)    Subject to the receipt of Regulatory Approvals and the compliance by each of the parties hereto with any conditions contained herein and therein, (i) the execution and delivery of this Agreement by each Purchaser, (ii) the consummation of the transactions contemplated hereby, and (iii) compliance by each Purchaser with any of the terms or provisions hereof, will not violate, conflict with, result in a breach of any provisions of, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which any of them is a party, or by which they or any of their respective properties or assets may be bound or affected, except for any

violations, conflicts, breaches, defaults or other occurrences which would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect.

4.2   <u>Consents</u>. Except for the Regulatory Approvals, no consents or approvals or waivers of, or filings or registrations with, any Governmental Entity are or will be necessary, and no consents or approvals of any third parties are or will be necessary, in connection with (a) the execution and delivery of this Agreement by each Purchaser and (b) the completion by each Purchaser of the transactions contemplated hereby.

4.3   <u>No Other Representations or Warranties</u>. Except for the representations and warranties made by each Purchaser in this Article IV, no Purchaser makes any express or implied representation or warranty of any kind or nature, and each Purchaser hereby disclaims any such other representations or warranties.

ARTICLE V<br>COVENANTS OF THE PARTIES

5.1   <u>Access to Information</u>. Stonebridge shall permit the Representatives of the Purchasers to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Bank, to the premises, personnel, books, records, and documents of or pertaining to the Bank's business; *provided*, that Stonebridge may restrict the foregoing access to the extent that in the reasonable judgment of Stonebridge, any Laws applicable to the Bank require Stonebridge to restrict access to any of the Bank's business, properties, information or personnel; and *provided*, *further*, that such access shall not unreasonably disrupt the operations of the Bank. The Purchasers shall comply with, and shall cause their Representatives to comply with, all of the obligations of the Purchasers under Section 5.6 (Confidentiality) hereto with respect to the terms and conditions of this Agreement, the transactions contemplated hereby and the information of the Bank and the Bank's business disclosed or accessed pursuant to this Section 5.1.

5.2   <u>Conduct of Business</u>.

(a)   <u>Affirmative Covenants</u>. From the date of this Agreement to the Closing Date, except with the written consent of the Purchasers, which consent shall not be unreasonably withheld, conditioned or delayed, Stonebridge will, and it will cause the Bank and each of its Subsidiaries to, (i) operate its business only in the usual, regular and ordinary course of business, (ii) use commercially reasonable efforts to preserve intact its business organization and assets and maintain its rights and franchises, and (iii) voluntarily take no action that would, or would be reasonably likely to, materially adversely affect the ability of the parties to obtain any Regulatory Approvals or other approvals of Governmental Entities required for the transactions contemplated hereby or materially increase the period of time necessary to obtain such approvals, or materially adversely affect its ability to perform its covenants and agreements under this Agreement.

5.3   <u>Maintenance of Insurance</u>. Stonebridge shall cause the Bank and each of its Subsidiaries to maintain insurance in such amounts as are reasonable to cover such risks as are

11

customary in relation to the character and location of their properties and the nature of their business, consistent with past practice.

5.4 <u>Notification of Certain Matters</u>. From time to time prior to the Closing Date, the parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on such party's part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); *provided, however*, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Disclosure Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

5.5 <u>Cooperation</u>. Subject in all respects to the Bankruptcy Code, the parties shall use their respective commercially reasonable efforts not involving litigation to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in Article VI and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing. Nothing in this Agreement shall be construed so as to prohibit or restrict Stonebridge from winding up its operations and, *provided* it has complied with its obligations under the Agreement that have arisen up to the date of such winding up, once it has done so, it shall have no further obligations hereunder.

5.6 <u>Confidentiality</u>. From and after the date hereof, each of the Purchasers shall, and shall cause their Affiliates and Representatives to, keep confidential and not disclose to any other Person or use for such Person's own benefit or the benefit of any other Person any confidential or proprietary information, materials, documents, technology, processes, know-how, customer lists, trade secrets (including all results of research and development and processes related thereto), product formulas, software, trade secrets, industrial designs, franchises, inventions and other intellectual property regarding Stonebridge, the Bank, their respective businesses or operations, or the terms of this Agreement and the transactions contemplated hereunder, including any and all information and other materials provided to or accessed by such Purchaser or its Representatives pursuant to this Agreement (collectively, "Confidential Information"). The obligations of each restricted Person under this Section 5.6 will not apply to Confidential Information which: (a) is or becomes generally available to the public without breach of the commitment provided for in this Section 5.6 by such restricted Person; or (b) is required to be disclosed by Law or Governmental Entity; *provided, however*, that, in any such case, the restricted Person subject to such requirement will (to the extent permitted by applicable Law) notify Stonebridge as soon as reasonably practicable before disclosure to allow Stonebridge to take appropriate measures to preserve the confidentiality of such Confidential Information. After the Closing, each Purchaser shall own the information it has purchased and shall be released from the confidentiality obligations with respect to that information.

5.7 <u>Certain Agreements</u>. From the date hereof through the Closing Date, and subject to the Sale Procedures Motion and the Sale Procedures Order, the Bank shall not enter into any

12

material contract or agreement, whether written or oral, other than those which are specifically contemplated by this Agreement.

    5.8    <u>Regulatory Matters</u>. Following the date hereof, except to the extent prohibited by Law, the Purchasers shall (i) consult with Stonebridge and allow Stonebridge to review and comment, on any filings, written notifications, or other documents submitted by the Purchasers to any Bank Regulator ("Regulatory Filings"), *provided*, that any changes to such Regulatory Filings requested by Stonebridge must be reasonably acceptable to the Purchasers; and (ii) provide copies to Stonebridge of any correspondence or written notifications sent by any Bank Regulator to the Purchasers, in connection with such Regulatory Filings, such copies to be provided promptly following the receipt of such correspondence or written notifications by the Purchasers.

ARTICLE VI
<u>CLOSING CONDITIONS</u>

    6.1    <u>Conditions to Each Party's Obligations under this Agreement</u>. The respective obligations of each party under this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

    (a)    <u>Regulatory Approvals</u>. All Regulatory Approvals, and other necessary approvals, authorizations and consents of any Governmental Entities required to consummate the transactions contemplated by this Agreement, the failure of which to obtain would reasonably be expected to have a Material Adverse Effect, shall have been obtained and shall remain in full force and effect and all waiting periods relating to such approvals, authorizations or consents shall have expired; and no such approval, authorization or consent shall include any condition or requirement that would, in the good faith reasonable judgment of the Board of Directors of Stonebridge or the Purchasers, materially and adversely affect the business, operations, financial condition, property, assets or value of the Bank, or otherwise impose conditions on any of Stonebridge, the Bank or the Purchasers that are not acceptable to any of Stonebridge, the Bank or the Purchasers.

    (b)    <u>Proceedings; Orders</u>. No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

    6.2    <u>Additional Conditions to Obligations of the Purchasers</u>. The obligations of the Purchasers to effect the Acquisition are subject to the satisfaction or waiver of the following additional conditions:

    (a)    <u>Representations and Warranties</u>. The representations and warranties of Stonebridge set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties

13

shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     _Agreements and Covenants_.  Stonebridge shall have performed in all material respects all obligations, and complied in all material respects with all agreements or covenants to be performed or complied with by it, at or prior to the Closing.

(c)     _Documents_.  All other documents, instruments and agreements required by this Agreement to be executed and/or delivered by Stonebridge on or prior to the Closing shall have been executed by the parties thereto other than the Purchasers and delivered to the Purchasers.

(d)     _Material Adverse Effect_.  No event has occurred, and no condition exists, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect on the ability of Stonebridge to consummate the Acquisition.

(e)     _Regulatory Approvals_.  Purchasers shall not be subject to any Regulatory Approvals, Orders, or other notices, requirements, obligations or conditions imposed or required by any Governmental Entity, in each case, in connection with the Acquisition, that is not reasonably acceptable to the Purchasers.

6.3     _Additional Conditions to Obligations of Stonebridge_.  The obligations of Stonebridge to effect the Acquisition are subject to the satisfaction or waiver by Stonebridge of the following additional conditions:

(a)     _Representations and Warranties_.  The representations and warranties of the Purchasers set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     _Agreements and Covenants_.  Each of the Purchasers shall have performed in all material respects all obligations, and complied in all material respects with all agreements or covenants to be performed or complied with by it, at or prior to the Closing.

(c)     _Documents_.  All other documents, instruments and agreements required by this Agreement to be executed and/or delivered by the Purchasers on or prior to the Closing shall have been executed by the parties thereto other than Stonebridge and delivered to Stonebridge.

ARTICLE VII
TERMINATION, AMENDMENT AND WAIVER

7.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date:

(a)    at any time by the mutual written agreement of Stonebridge and the Purchasers;

(b)    by either Stonebridge, on the one hand, or the Purchasers, on the other hand (*provided*, that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach of any of the representations or warranties set forth in this Agreement on the part of the other party (the "Breaching Party"), which breach by its nature cannot be cured prior to the Termination Date or shall not have been cured within 30 days after written notice of such breach by the terminating party to the Breaching Party; *provided, however*, that neither party shall have the right to terminate this Agreement pursuant to this Section 7.1(b) unless the breach of representation or warranty, together with all other such breaches, would entitle the terminating party not to consummate the transactions contemplated hereby under Sections 6.2(a) or 6.2(b) (in the event that Stonebridge is the Breaching Party) or Sections 6.3(a) or 6.3(b) (in the event that any Purchaser is the Breaching Party);

(c)    by either Stonebridge, on the one hand, or the Purchasers, on the other hand (*provided*, that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material failure to perform or comply with any of the covenants or agreements set forth in this Agreement on the part of the other party (the "Failing Party"), which failure by its nature cannot be cured prior to the Termination Date or shall not have been cured within 30 days after written notice of such failure by the terminating party to the Failing Party; *provided, however*, that neither party shall have the right to terminate this Agreement pursuant to this Section 7.1(c) unless the breach of such covenant or agreement, together with all other such breaches, would entitle the terminating party not to consummate the transactions contemplated hereby under Sections 6.2(a) or 6.2(b) (in the that Stonebridge is the Failing Party) or Sections 6.3(a) or 6.3(b) (in the event that any Purchaser is the Failing Party);

(d)    by either Stonebridge, on the one hand, or the Purchasers, on the other hand, if the Closing shall not have occurred by the Termination Date, or such later date as shall have been agreed to in writing by the parties hereto; *provided*, that no party may terminate this Agreement pursuant to this Section 7.1(d) if the failure of the Closing to have occurred on or before said date was due to such party's material breach of any representation, warranty, covenant or other agreement contained in this Agreement;

(e)    by either Stonebridge, on the one hand, or the Purchasers, on the other hand, if (i) final action has been taken by a Bank Regulator whose approval is required in connection with this Agreement and the transactions contemplated hereby, which final action (A) has become nonappealable and (B) does not approve this Agreement or the transactions contemplated hereby, or (ii) the Bankruptcy Court or any other court of competent jurisdiction or

other Governmental Entity shall have issued an Order, decree, ruling or taken any other action restraining, enjoining or otherwise prohibiting the Acquisition and such Order, decree, ruling or other action shall have become final and nonappealable;

(f)    Automatically, and without further action by any party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, *provided* that neither Stonebridge nor the Purchaser shall take any action to support entry of such an Order;

(g)    Automatically, and without further action by any party, if (i) the Purchasers are not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchasers are the Backup Bidder, upon Closing with the Successful Bidder.

7.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to any provision of Section 7.1, this Agreement shall forthwith become void and have no further force, except that the provisions of Section 5.6 (Confidentiality), this Section 7.2, Section 8.1 (Public Announcements), Section 8.3 (Expenses), Section 8.4 (Notices), Section 8.6 (Complete Agreement), Section 8.9 (Governing Law), Section 8.11 (Interpretation), and any other Section which, by its terms, relates to post-termination rights or obligations, shall survive such termination of this Agreement and remain in full force and effect.

(b)    In the event that the Purchasers are not the Successful Bidder, Stonebridge shall, within two business days of the closing of a transaction with the Successful Bidder, pay to the Purchasers the Termination Fee with the obligation of Stonebridge to pay such Termination Fee deemed an allowed administrative expense claim under section 503(b) of the Bankruptcy Code. Such payments shall be made by wire transfer of immediately available funds to an account or accounts designated by the Purchasers.

(c)    Upon termination of this Agreement (x) pursuant to Section 7.1(a), (d), (e) or (g), the Escrow Agent shall promptly disburse the Deposit to the Purchasers pursuant to the terms of the Bid Procedures, (y) if Stonebridge is the Breaching Party or Failing Party, as applicable pursuant to Section 7.1(b) or (c), the Escrow Agent shall immediately disburse the Deposit to the Purchasers upon the entry of a Final Order by the Bankruptcy Court finding that there has been a breach or failure by Stonebridge of the type described in Sections 7.1(b) or (c) which has not been cured within the applicable time period set forth therein (or is not curable), or (z) if any Purchaser is the Breaching Party or Failing Party, as applicable pursuant to Section 7.1(b) or (c), the Escrow Agent shall immediately disburse the Deposit (and all interest thereon) to Stonebridge upon the entry of a Final Order by the Bankruptcy Court finding that there has been a breach or failure by any Purchaser of the type described in Sections 7.1(b) or (c) which has not been cured within the applicable time period set forth therein (or is not curable). The requirement for the entry of a Final Order for the disbursement of the Deposit as set forth in clauses (y) and (z) of the preceding sentence shall not be interpreted so as to require the entry of a Final Order before either Stonebridge, on the one hand, or the Purchasers, on the other hand, may exercise their respective rights to terminate this Agreement pursuant to Sections 7.1(b) or

(c), as applicable. If any party purports to terminate this Agreement based on an alleged breach or failure of this Agreement by the other party and if such other party shall dispute whether such breach occurred, the non-prevailing party shall pay 50% of the prevailing party's legal fees and reasonable expenses related to such dispute in addition to whatever other remedies may be available to the prevailing party, including specific performance.

      7.3    <u>Amendment, Extension and Waiver</u>.  Subject to applicable Law, and except as provided in this Agreement, at any time prior to the Closing the parties hereto by action of (x) Stonebridge's Board of Directors and (y) the consent of the Purchasers, may (a) amend this Agreement, (b) extend the time for the performance of any of the obligations or other acts of any other party hereto, (c) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, or (d) waive compliance with any of the agreements or conditions contained herein.  Other than as otherwise set forth in this Section 7.3, this Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  Any agreement on the part of a party hereto to any extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party, but such waiver or failure to insist on strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

ARTICLE VIII<br><u>MISCELLANEOUS</u>

      8.1    <u>Public Announcements</u>.  The parties hereto shall cooperate with each other in the development and distribution of all news releases and other public disclosures with respect to this Agreement, and except as may be otherwise required by Law, no party hereto shall issue any news release, or other public announcement or communication with respect to this Agreement unless such news release, public announcement or communication has been mutually agreed upon by the parties hereto.

      8.2    <u>Survival</u>.  All representations, warranties and covenants in this Agreement or in any instrument delivered pursuant hereto or thereto shall expire on and be terminated and extinguished at the Closing Date, except for those covenants and agreements contained herein which by their terms apply in whole or in part after the Closing.

      8.3    <u>Expenses</u>.  Each party hereto shall bear and pay all costs and expenses incurred by it in connection with the transactions contemplated hereby, including fees and expenses of its own financial advisors, accountants and legal counsel.

      8.4    <u>Notices</u>.  All notices or other communications hereunder shall be in writing and shall be deemed given if delivered by receipted hand delivery, mailed by United States prepaid registered or certified mail (return receipt requested), or by a nationally recognized overnight courier promising next business day delivery, addressed as follows:

      If to Stonebridge, to:      Stonebridge Financial Corp.
      605 Willowbrook Lane
      West Chester, PA 19382

17

                                              Attn: Daniel J. Machon, Jr.
      Fax: (610) 719-8225
      E-mail: dmachon@stonebridgebank.com

With required copies
(which shall not constitute notice) to:    Daniel J. Machon, Jr. c/o Stonebridge Bank
      605 Willowbrook Lane
      West Chester, PA 19382
      Fax: (610) 719-8225
      E-mail: dmachon@stonebridgebank.com

If to the Bank, to:    Stonebridge Bank
      605 Willowbrook Lane
      West Chester, PA 19382
      Attn: Daniel J. Machon, Jr., President and CEO
      Fax: (610) 719-8225
      E-mail: dmachon@stonebridgebank.com

With required copies
(which shall not constitute notice) to:    Stephen T. Burdumy, Esq.
      Drinker Biddle & Reath LLP
      One Logan Square, Suite 2000
      Philadelphia, Pennsylvania 19103
      Fax:  (215) 988-2757
      E-mail: Stephen.Burdumy@dbr.com

If to the Purchasers, to:    Gerald Parsons
      c/o Communications Test Design, Inc
      1373 Enterprise Drive
      West Chester, PA 19380
      Fax: (610) 429-3861
      E-mail: jparsons@ctdi.com

With required copies
(which shall not constitute notice) to:    Joseph S. Nescio
      Nescio & Seace, LLP
      113 East Evans Street
      Matlack Building, Suite D-2
      West Chester, PA 19380
      Fax: (610) 436-5023
      E-Mail: nesciolaw@verizon.net

or such other address as shall be furnished in writing by any party, and any such notice or communication shall be deemed to have been given:  (a) as of the date delivered by hand; (b) three (3) business days after being delivered to the U.S. mail, postage prepaid; or (c) one (1) business day after being delivered to the overnight courier and requesting next business day delivery.

8.5    Parties in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; *provided*, *however*, that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party without the prior written consent of the other parties hereto.  Except as otherwise expressly provided by this Agreement, following the Closing, nothing in this Agreement, express or implied, is intended to confer upon any Person, other than the parties hereto and their respective successors, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

8.6    Complete Agreement.  This Agreement, including the Exhibits and Disclosure Schedules hereto, the documents and other writings referred to herein or therein or delivered pursuant hereto, contains the entire agreement and understanding of the parties with respect to its subject matter.  There are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties other than those expressly set forth herein or therein.  This Agreement supersedes all prior agreements and understandings between the parties, both written and oral, with respect to its subject matter.

8.7    Counterparts.  This Agreement may be executed in one or more counterparts all of which shall be considered one and the same agreement and each of which shall be deemed an original.  A facsimile copy or electronic transmission of a signature page shall be deemed to be an original signature page.

8.8    Severability.  In the event that any one or more provisions of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, by any court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement and the parties shall use commercially reasonable efforts to substitute a valid, legal and enforceable provision which, insofar as practical, implements the purposes and intents of this Agreement.

8.9    Governing Law.  This Agreement shall be governed by the Laws of the Commonwealth of Pennsylvania, without giving effect to its Laws or principles of conflicts of laws.  The parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; *provided*, *however*, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement, shall be in the United States District Court for the Eastern District of Pennsylvania or in any state court in the Commonwealth of Pennsylvania, this being in addition to any other remedy to which they are entitled at law or in equity, and the parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*).  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.10    <u>Purchaser Liability</u>.  Notwithstanding anything to the contrary set forth herein, the obligations of the Purchasers to purchase the Bank Stock are several and not joint obligations and no Purchaser shall have any liability to any other Purchaser for the performance or non-performance of any obligation by any other Purchaser hereunder.

8.11    <u>Interpretation</u>.  When a reference is made in this Agreement to Sections or Exhibits, such reference shall be to a Section of or Exhibit to this Agreement unless otherwise indicated.  The Recitals hereto constitute an integral part of this Agreement.  References to Sections include subsections, which are part of the related Section (e.g., a section numbered "Section 2.2(a)" would be part of "Section 2.2" and references to "Section 2.2" would also refer to material contained in the subsection described as "Section 2.2(a)").  The table of contents, index and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The phrases "the date of this Agreement", "the date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the Preamble to this Agreement.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal by their duly authorized officers as of the date first set forth above.

STONEBRIDGE FINANCIAL CORP., a
Pennsylvania corporation

By: _____
Name:  Joseph C. Petrone
Title:  Chief Financial Officer

PURCHASERS:

_____
By:  Gerald J. Parsons

_____
By:  Leo D. Parsons

_____
By:  John J. Butler

_____
By:  Thomas B. Murphy, III

_____
By:  Daniel J. Machon, Jr.

_____
By:  J. Richard Leaman, Jr.

_____
By:  Clair M. Raubenstine

[Signature Page to the Stonebridge Stock Purchase Agreement]

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal by their duly authorized officers as of the date first set forth above.

STONEBRIDGE FINANCIAL CORP., a Pennsylvania corporation

By: _____
     Name:
     Title:

PURCHASERS:

_____
By: Gerald J. Parsons

_____
By: Leo D. Parsons

_____
By: John J. Butler

_____
By: Thomas B. Murphy, III

_____
By: Daniel J. Machon, Jr.

_____
By: J. Richard Leaman, Jr.

_____
By: Clair M. Raubenstine

[Signature Page to the Stonebridge Stock Purchase Agreement]

21

## SCHEDULE 1

## SCHEDULE OF PURCHASERS

| Purchaser | Percentage Ownership |
| --- | --- |
| Gerald J. Parsons | 58.83 % |
| Leo D. Parsons | 23.53 % |
| John J. Butler | 5.88 % |
| Thomas B. Murphy, III | 2.94 % |
| Daniel J. Machon, Jr. | 2.94 % |
| J. Richard Leaman, Jr. | 2.94 % |
| Clair M. Raubenstine | 2.94 % |
| **Total:** | **100.00 %** |

EXHIBIT A

SALE PROCEDURES ORDER

[To be provided.]